**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 12-4630**

---

UNITED STATES OF AMERICA,

           Plaintiff - Appellee,

     v.

SUADO MOHAMED ALI, a/k/a Suada Mohamed Ali, a/k/a Sue,

           Defendant - Appellant.

---

**No. 12-4631**

---

UNITED STATES OF AMERICA,

           Plaintiff - Appellee,

     v.

AHMED ALI HASSAN, a/k/a Dirir,

           Defendant - Appellant.

---

**No. 12-4632**

---

UNITED STATES OF AMERICA,

           Plaintiff - Appellee,

     v.

ABDIRAHMAN ABSHIR JIBRIL, a/k/a Abdi Ali Mire,

               Defendant - Appellant.

-------------------------------

**No. 12-4657**

-------------------------------

UNITED STATES OF AMERICA,

               Plaintiff - Appellee,

       v.

HARUN SALHAN,

               Defendant - Appellant.

-------------------------------

**No. 12-4672**

-------------------------------

UNITED STATES OF AMERICA,

               Plaintiff - Appellee,

       v.

HIBO MUSSE SAMANTAR, a/k/a Fadumo,

               Defendant - Appellant.

-------------------------------

**No. 12-4674**

-------------------------------

UNITED STATES OF AMERICA,

               Plaintiff - Appellee,

       v.

ABOKOR GURREH, a/k/a Mohamed Farhan, a/k/a Mubarak, a/k/a
Farhan M. Mohamed,

                  Defendant - Appellant.

---

**No. 12-4675**

---

UNITED STATES OF AMERICA,

                  Plaintiff - Appellee,

       v.

NAGI MANSOR SEAA ALASHMALI, a/k/a Mohamed Albokhiti,

                  Defendant - Appellant.

---

**No. 12-4676**

---

UNITED STATES OF AMERICA,

                  Plaintiff - Appellee,

       v.

KHALED AHMED ISA, a/k/a Hamza, a/k/a Adnan, a/k/a Khalid
Ahmed Aesaa, a/k/a Khaled A. Aesa,

                  Defendant - Appellant.

---

**No. 12-4679**

---

UNITED STATES OF AMERICA,

                  Plaintiff - Appellee,

       v.

ISMAIL MOHAMUD ABDI,

                Defendant - Appellant.

_____

**No. 12-4682**

UNITED STATES OF AMERICA,

                Plaintiff - Appellee,

      v.

ABDI MUHUMED, a/k/a Juba,

                Defendant - Appellant.

_____

**No. 12-4687**

UNITED STATES OF AMERICA,

                Plaintiff - Appellee,

      v.

LUTF MOHAMED ALBUKHAITI,

                Defendant - Appellant.

_____

**No. 12-4699**

UNITED STATES OF AMERICA,

                Plaintiff - Appellee,

      v.

4

ABDI OMAR ABDI,

   Defendant - Appellant.

---

**No. 12-4700**

---

UNITED STATES OF AMERICA,

   Plaintiff - Appellee,

  v.

OSMAN YUSUF,

   Defendant - Appellant.

---

Appeals from the United States District Court for the Eastern
District of Virginia, at Alexandria.  T. S. Ellis, III, Senior
District  Judge.  (1:11-cr-00261-TSE-4;  1:11-cr-00261-TSE-6;
1:11-cr-00261-TSE-8;  1:11-cr-00261-TSE-9;  1:11-cr-00261-TSE-5;
1:11-cr-00261-TSE-17;  1:11-cr-00261-TSE-1;  1:11-cr-00261-TSE-15;
1:11-cr-00261-TSE-11;  1:11-cr-00261-TSE-12;  1:11-cr-00261-TSE-13;  1:11-cr-00261-TSE-16; 1:11-cr-00261-TSE-7)

---

Argued:  September 19, 2013    Decided:  November 14, 2013

---

Before NIEMEYER, GREGORY, and FLOYD, Circuit Judges.

---

Affirmed  by  published  opinion.   Judge  Niemeyer  wrote  the
opinion, in which Judge Gregory and Judge Floyd joined.

---

**ARGUED:**  Joseph  John  McCarthy,  DELANEY,  MCCARTHY  &  COLTON,  PC,
Alexandria,  Virginia;   Thomas  Brian  Walsh,  PETROVICH  &  WALSH,
PLC,  Fairfax,  Virginia;   William  B.  Cummings,  WILLIAM  B.
CUMMINGS,  PC,  Alexandria,  Virginia,  for  Appellants.   Michael
John Frank, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria,
Virginia,  for  Appellee.   **ON BRIEF:**  Michael  S.  Arif,  ARIF  &
ASSOCIATES, PC, Springfield, Virginia, for Appellant Ahmed Ali

Hassan.   Bruce M. Cooper, Washington, D.C., for Appellant Harun
Salhan.   Alfred L. Robertson, Jr., ROBERTSON LAW OFFICE, PLLC,
Alexandria, Virginia, for Appellant Hibo Musse Samantar.   John
O. Iweanoge, II,   THE IWEANOGE'S FIRM, P.C., Washington, D.C.,
for Appellant Suado Mohamed Ali. Frank Salvato, Alexandria,
Virginia, for Appellant Ismail Mohamud Abdi.   Anser Ahmad,
ADVANCED IMMIGRATION LAW GROUP, PC, Harrisburg, Pennsylvania,
for Appellant Abdi Muhumed.   Daniel T. Lopez, BRIGLIA HUNDLEY
NUTALL & KAY PC, Vienna, Virginia, for Appellant Osman Yusuf.
John L. Machado, LAW OFFICE OF JOHN MACHADO, Washington, D.C.,
for Appellant Abokor Gurreh.   Gary H. Smith, GARY H. SMITH
ATTORNEY AT LAW, Alexandria, Virginia, for Appellant Abdi Omar
Abdi.   Robert L. Jenkins, Jr., BYNUM & JENKINS, PLLC,
Alexandria, Virginia, for Appellant Lutf Mohamed Albukhaiti.
Neil H. MacBride, United States Attorney, Kyle Maurer, Special
Assistant United States Attorney, Mary K. Daly, Assistant United
States Attorney, OFFICE OF THE UNITED STATES ATTORNEY,
Alexandria, Virginia, for Appellee.

---

NIEMEYER, Circuit Judge:

Seventeen individuals, all originally from Somalia or Yemen, were indicted for their participation in a large conspiracy to traffic in khat, a leafy plant native to the Horn of Africa. Khat contains the controlled substance cathinone, which is desired for the euphoria it provides when khat leaves are chewed. Thirteen of the defendants were also charged with conspiracy to commit money laundering.

After four of the defendants pleaded guilty pursuant to plea agreements, the remaining thirteen proceeded to trial and were convicted of all charges, except one, who was acquitted of the money laundering charge. All thirteen defendants filed this appeal, arguing principally that the evidence was insufficient to convict them because it failed to show that they knew that cathinone was a controlled substance and that khat contained cathinone. In a similar vein, they challenge the district court's jury instructions relating to scienter and willful blindness. The defendants convicted of money laundering contend that the indictment failed to adequately identify the financial transactions and other details so as to give them sufficient notice of the charges. And finally, the defendants challenge the district court's procedural rulings to exclude their expert witness and, as to one defendant, to deny a motion for severance.

7

After careful consideration of the defendants' arguments and the large record in this case, we affirm.

I

Khat (pronounced "cot") is a leafy shrub that grows in East Africa and part of the Arabian peninsula, principally in Ethiopia, Yemen, and Kenya. When khat is fresh, it contains the alkaloid cathinone, which is a stimulant, and chewing khat leaves causes excitement, loss of appetite, and euphoria. The cathinone in khat degrades after it is picked, breaking down after a few days into the less potent drug, cathine. Consequently, fresh khat is more desirable to its users and thus more expensive and more profitable to its sellers.

While khat itself is not a controlled substance, the cathinone in fresh khat is a Schedule I controlled substance, see 21 C.F.R. § 1308.11(f)(3), and the less-potent cathine in stale khat is a Schedule IV controlled substance, see 21 C.F.R. § 1308.14(f)(1). Accordingly, it is illegal to possess, distribute, buy, or sell khat, although the defendants point out that khat is not illegal in some east African countries, and in those countries, its use is common in social settings.

Typically, khat is harvested in Kenya and flown in bundles, first to Europe and then to the United States. Each bundle typically contains 40 to 60 stems and leaves and is bound by

8

banana leaves to preserve freshness.  Because it is perishable, khat is typically not stored.  During the period relevant to this case, fresh khat in the United States sold for up to $60 per bundle at retail and $50 at wholesale.

In August 2008, federal law enforcement officers began an investigation into the importation of khat into the United States and its subsequent distribution, ultimately leading them to Yonis Ishak, the head of a large-scale distribution operation.  Ishak's enterprise distributed some 10 to 11 million grams of khat over a period from February 2005 to May 2011 in the Baltimore/Washington area (including northern Virginia), New York City, and Columbus, Ohio.  Law enforcement also discovered that proceeds from the sale of khat were laundered through the Virginia branch of Dahabshil, Inc., a wire transfer service, and sent to Ishak's overseas suppliers in the United Kingdom and Africa.

In June 2011, Ishak and 16 co-conspirators were indicted for conspiracy to possess with intent to distribute cathinone, in violation of 21 U.S.C. §§ 841(a) and 846, and 13 of the defendants were also indicted for conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h).  Ishak and three other defendants pleaded guilty to Count 1 pursuant to plea agreements, and the remaining 13 defendants proceeded to

trial on April 17, 2012.  Pursuant to his plea agreement, Ishak served as the government's principal witness.[*]

At the outset of trial, the defendants charged with money laundering moved to dismiss that count because the indictment neglected to allege "which of the qualifying financial transactions the defendant conducted or attempted to conduct." They argued that the deficiency left open the possibility that the jury could make a finding not charged by the grand jury, in derogation of each defendant's Fifth Amendment rights.  The district court denied the motion as untimely but invited these defendants to renew their arguments at trial through a sufficiency of the evidence motion under Federal Rule of Criminal Procedure 29.

Prior to the conclusion of trial, defendant Abokor Gurreh filed a motion for severance of his trial on the ground that another defendant had presented evidence antagonistic to Gurreh's interest.  The district court denied the motion.  Also

---

[*] Thirteen of the seventeen defendants were named defendants in both Counts 1 and 2:  Abdi Omar Abdi, Ismail Mohamud Abdi, Lutf Mohamed Albukhaiti, Suado Mohamed Ali, Abokor Gurreh, Hassan Hassan, Khaled Ahmed Isa, Yonis Muhudin Ishak, Abdulkadir Ali Isse, Abdirahman Abshir Jibril, Abdi Muhumed, Harun Salhan, and Osman Yusuf.  And four defendants were named defendants only in Count 1:  Nagi Mansor Seaa Alashmali, Ahmed Ali Hassan, Moheeb Ahmed Mohammed Nasser, and Hibo Musse Samantar. Defendants Ishak, Ali Isse, Hassan Hassan, and Nasser pleaded guilty to Count 1, pursuant to a plea agreement, and the remaining defendants were convicted by the jury on all counts, except that Harun Salhan was acquitted on Count 2.

during trial, the court excluded the testimony of the
defendants' expert witness regarding the chemical nature of khat
on the basis that the defendants' designation of the expert at
trial was not timely and that, in addition, the proffered
testimony was not relevant.

At the conclusion of the evidence, the defendants moved for
acquittal under Rule 29, arguing that the government did not
present sufficient evidence of scienter because it failed to
establish that the defendants knew that cathinone was a
controlled substance and that khat contained cathinone.  The
court denied the motion, concluding that, to prove scienter, the
government was required only to show that defendants knew that
khat contained a controlled substance.  It also instructed the
jury to that effect.  In the same vein, it gave the jury an
instruction on willful blindness, to which the defendants
objected.

The jury convicted the 13 defendants on all counts, except
Harun Salhan, who was acquitted on Count 2 (the money laundering
count), and the court imposed prison sentences on the defendants
ranging from 3 months to 12 months and a day.

These appeals followed.

II

The defendants first contend that the district court erred in instructing the jury on both scienter and willful blindness. They argue that, by allowing the government to prove simply that they trafficked in khat and knew that khat contained a controlled substance, the court reduced the government's burden to prove that the defendants conspired knowingly to distribute cathinone or knowingly to possess cathinone with intent to distribute it.   The defendants also contend that the evidence did not support a willful blindness instruction.   We address these challenges seriatim.

A

With respect to scienter, the defendants argue that "the government bore the burden of proving [that they] knew cathinone was a controlled substance and that it was contained in khat." As they point out, Count 1 of the indictment charged that the defendants did

> unlawfully, knowingly, and intentionally . . .
> conspire  .  .  .  to  unlawfully,  knowingly  and
> intentionally distribute, and to possess with intent
> to distribute, a mixture and substance containing a
> detectable amount of cathinone, a Schedule I
> controlled substance.

(Emphasis added).  They note that the indictment did not charge that they conspired to distribute or to possess with intent to distribute khat, a fact that the government clearly proved.

12

They rightly state that it would not be sufficient for the government to prove scienter as to the distribution of khat because khat itself is not listed as a controlled substance. They argue that rather than instructing the jury on scienter as to the trafficking in <u>cathinone</u>, the district court relieved the government of this burden by instructing the jury as follows:

> The phrase "knowingly and intentionally," as used in the offense charged in Count 1 of the superseding indictment, requires the government to prove beyond a reasonable doubt that a defendant knew that what he or she conspired to distribute or to possess with intent to distribute was or contained <u>a controlled substance,</u> <u>meaning a substance that is illegal under the U.S.</u> <u>drug laws</u>.
>
> \*     \*     \*
>
> However, as long as you find that the government has proven beyond a reasonable doubt that a defendant knew that what he or she had conspired to distribute or to possess with intent to distribute contained a substance that is illegal under the U.S. drug laws, <u>you do not need to find that a particular defendant</u> <u>knew the precise nature or chemical name of the</u> <u>specific controlled substance</u>.
>
> <u>In other words, the government is not required to</u> <u>prove that the defendants knew that khat may contain a</u> <u>controlled substance with the chemical name of</u> <u>cathinone</u>, but the government must prove beyond a reasonable doubt that the defendant knew that some controlled substance, that is, a substance that is illegal under the U.S. drug laws, was contained in the khat they allegedly conspired to distribute or to possess with intent to distribute. The law does not require that a defendant . . . knew the proper chemical name of a substance so long as the defendant knew that a substance was illegal under the U.S. drug laws.

(Emphasis added).

13

In short, the defendants maintain that "because conspiracy is a specific intent crime, . . . the government must prove [that the defendants] specifically knew cathinone, the substance alleged by the grand jury in Count One, was a controlled substance and that it was contained in khat."  They argue that the jury could have "relied on evidence that khat was a controlled substance" because of the nature of the district court's instruction.  They conclude that "this allowed an impermissible constructive amendment of the indictment."

Generally, we review a district court's decision whether to give an instruction or how to formulate an instruction for abuse of discretion.  See, e.g., Noel v. Artson, 641 F.3d 580, 586 (4th Cir. 2011).  But we review the correctness of a jury instruction regarding the elements of an offense de novo, as a question of law.  See United States v. Horton, 321 F.3d 476, 479 (4th Cir. 2003).

Count 1 of the superseding indictment charged the defendants with conspiring, under 21 U.S.C. § 846, to violate the drug trafficking prohibitions contained in 21 U.S.C. § 841(a)(1).  Because § 846 looks to an underlying offense, the mens rea of § 846 is derived from that of the underlying offense, in this case § 841(a).  See United States v. Deffenbaugh, 709 F.3d 266, 272 (4th Cir. 2013).

The mens rea of § 841(a) is articulated explicitly in the statute.   Section 841(a) makes it unlawful for a person "knowingly or intentionally to . . . distribute . . . a controlled substance" or "knowingly or intentionally to . . . possess with intent to . . . distribute . . . a controlled substance."   21 U.S.C. § 841(a)(1).   Thus, while the statute requires specific intent to distribute a controlled substance or to possess with intent to distribute a controlled substance, it does not require that the defendant have, within that intent, specific knowledge of the controlled substance or any of the chemicals, derivatives, isomers, esters, ethers, or salts that constitute the controlled substance.   See 21 U.S.C. § 812.

Of course, the fact that the defendant must only know that the khat he is distributing or possessing with intent to distribute contains an unspecified controlled substance does not relieve the government of proving that that substance was in fact on the controlled substance list.   Thus, in this case it would not be sufficient for the government to prove that the substance distributed was khat, because khat is not listed as a controlled substance.   Rather, the government had to prove that the khat it seized from the defendants actually contained cathinone, a controlled substance.   As for mens rea, though, the government need only prove that the defendants knew that their

15

khat contained some controlled substance, which it could do without showing that the defendants had ever heard of cathinone.

This scope of scienter for a violation of § 841 is not only provided by the text of the statute but is also the view taken by every court of appeals that has considered the issue. For instance, in United States v. Abdulle, 564 F.3d 119 (2d Cir. 2009), then-Judge Sotomayor stated:

> [T]he law is settled that a defendant need not know the exact nature of a drug in his possession to violate § 841(a)(1); it is sufficient that he [or she] be aware that he [or she] possesses some controlled substance. Because khat is not listed on the controlled substance schedules, the mens rea requirement of § 841(a) cannot be satisfied merely by proving that the defendant knowingly possessed khat. Instead, where the government seeks to satisfy the mens rea requirement of § 841(a) for a khat-related offense, the government must prove that the defendant knew he or she possessed some regulated substance.

Id. at 125-26 (internal quotation marks and citations omitted) (emphasis added); see also United States v. Mire, 725 F.3d 665, 679 (7th Cir. 2013) ("It does not matter whether Mire knew that khat contained cathinone or cathine; all that matters is Mire knew that khat contained an illegal substance"); United States v. Hassan, 578 F.3d 108, 123 (2d Cir. 2008) (Specific intent requires "that the defendant 'knowingly or intentionally' imported or possessed with intent to distribute khat with a controlled substance"); United States v. Caseer, 399 F.3d 828, 841 (6th Cir. 2005) (Defendant must only "actually [know] that

16

khat contained a controlled substance"); United States v. Hussein, 351 F.3d 9, 11 (1st Cir. 2003) ("[T]he government can satisfy the scienter requirement . . . notwithstanding the fact that the accused was unaware of the drug's precise identity so long as it is able to prove beyond a reasonable doubt that he knew he was dealing with a substance regulated by federal drug abuse laws"); United States v. Carrera, 259 F.3d 818, 830 (7th Cir. 2001) ("The government need only prove that the defendant was aware that some controlled substance was involved").

Accordingly, we conclude that the district court did not err in instructing the jury on scienter.

B

With respect to the willful blindness instruction, the defendants argue that the district court abused its discretion in giving the instruction. The court told the jury:

> Now, the government may prove that a defendant acted knowingly by proving beyond a reasonable doubt that the defendant deliberately closed his or her eyes to what would otherwise have been obvious to him or her. No one can avoid responsibility for a crime by deliberately ignoring what is obvious. A finding beyond a reasonable doubt of an intent of the defendant to avoid knowledge or enlightenment would permit the jury to infer knowledge. Stated another way, a defendant's knowledge of a particular fact may be inferred from a deliberate or intentional ignorance or deliberate or intentional blindness to the existence of that fact.

The defendants point out that such an instruction should not have been given without evidence that they deliberately ignored

17

relevant facts. They maintain that in this case, "[t]here simply is no evidence in record supporting the position that any [defendant] understood khat contained cathinone or any controlled substance."

Inasmuch as the defendants' challenge focuses on whether the court should have given the instruction, and not on its substance, we review the court's decision for abuse of discretion. See United States v. Jinwright, 683 F.3d 471, 478 (4th Cir. 2012).

It is well established that where a defendant asserts that he did not have the requisite mens rea to meet the elements of the crime but "evidence supports an inference of deliberate ignorance," a willful blindness instruction to the jury is appropriate. United States v. Ruhe, 191 F.3d 376, 384 (4th Cir. 1999) (quoting United States v. Gruenberg, 989 F.2d 971, 974 (8th Cir. 1993)) (internal quotation marks omitted). To be sure, caution must be exercised in giving a willful blindness instruction, and therefore it is appropriate only in rare circumstances. Id. at 385. But we have affirmed its use in circumstances much like those presented here. In Ruhe, the owner of an aircraft repair facility was convicted for conspiring to transport stolen airplane parts in interstate commerce. Although the owner of the facility did not himself know that the parts were stolen, he ignored warning signs from

18

his employees, such as a lack of documentation for the parts and labels of "To be scrapped" on the parts. Id. at 380-81. With those warning signs, we upheld the use of a willful blindness instruction.

We conclude that Ruhe justifies the court's instruction in this case. The defendants here also had warning signs that khat contained an unlawful substance. The record is filled with evidence about how khat was transferred in discreet handoffs and unmarked packages; how the money obtained from khat sales was carefully broken up and hidden; how various defendants described methods for avoiding detection; how khat had drug-like properties like other controlled substances; and how defendants sought fresh khat to maximize those drug-like properties. In these circumstances, we believe it was not an abuse of discretion for the court to have given a willful blindness instruction, particularly since the court also gave a cautionary instruction to the jury:

> It is, of course, entirely up to you as to whether you find any deliberate ignorance or deliberate closing of the eyes and the inferences to be drawn from any such evidence. You may not infer that a defendant had knowledge, however, from proof of a mistake or negligence or carelessness or a belief in an inaccurate proposition.

III

For their principal argument on appeal, the defendants contend that even under our announced standard, the evidence was insufficient to convict them on Count 1, which charged them with conspiring to traffic in the controlled substance of cathinone. They do not suggest that the evidence was insufficient to show that they possessed khat with intent to distribute it but rather, that the evidence was insufficient to prove that they knew that khat contained a controlled substance. The sufficiency of the evidence, which we take in the light most favorable to the government, is a question of law that we review de novo. See United States v. Campbell, 977 F.2d 854, 856 (4th Cir. 1992).

It is true that the record contains only limited direct evidence that the defendants knew that khat contained a controlled substance. Gurreh clearly knew, as he had previously been convicted of trafficking in khat, and Ismail Abdi admitted in an interview with the FBI that he believed that khat was unlawful. Similarly, Jibril and Yusuf both worked for a money transfer business, and as part of their employment, both men received training in identifying money transfers related to khat trafficking. Nonetheless, all defendants conducted themselves in a manner that indicated circumstantially that they knew that khat contained a controlled substance. See United States v.

20

Santos, 553 U.S. 507, 521 (2008) ("[Scienter] will be provable (as knowledge must always be proved) by circumstantial evidence").

Critically, the head of the conspiracy, Ishak, testified on behalf of the government and implicated all defendants in the conspiracy. Numerous recorded telephone calls between him and his co-conspirators were introduced into evidence indicating that all conspirators were aware of the structure of Ishak's enterprise and participated in various aspects of it. The enterprise involved importing khat from Kenya, through Europe, and into the United States via couriers, who carried packages designed to disguise their contents. Individual deliveries of khat to various conspirators were often made in circumstances that were surreptitious and totally distinguishable from open and normal channels of business, such as from a public store or a publicly accessible shopping site. Telephone conversations among conspirators often referred to methods of avoiding police suspicion and to interceptions of khat at the border. While interceptions at the border could, no doubt, be attributable to the enforcement of benign agricultural regulations, see Caseer, 399 F.3d at 844, none of the many conversations among conspirators even suggested that agricultural regulations were the cause of their concerns. When the conspirators did discuss law enforcement, their concerns focused on avoiding detection by

state and local police officers, who presumably would be uninterested in enforcing U.S. customs regulations related to the importation of non-descript plants. Money collected from the sale of khat was also treated surreptitiously and awkwardly to avoid suspicion, as payments were broken into parts and sent to suppliers in the United Kingdom and Africa under altered or false names, and the record is replete with evidence of how such payments were designed to avoid any linkage with khat trafficking. It is almost impossible to conclude that any defendant did not know of at least some illegal aspects of the enterprise because the conspiracy continued for years.

We find support in this regard in the decisions of numerous other courts that have accepted circumstantial evidence in khat cases of this type to prove scienter. Courts have concluded, for example, that evasive behavior that seeks to avoid police detection of khat activity, including a denial of owning khat, evinces knowledge that khat contains a controlled substance. See Mire, 725 F.3d at 679. Likewise does misleading the police during interrogation, id.; discussing with other conspirators how to best evade detection, see United States v. Awad, 518 F. Supp. 2d 577 (S.D.N.Y. 2007); or carefully orchestrating distribution in a way so as to evade detection, see United States v. Hussein, 351 F.3d 9, 20 (1st Cir. 2003). Other indicators have also been accepted as circumstantial evidence of

22

scienter, such as knowledge that khat produces a high much like other controlled substances, see id.; knowledge that khat can be seized at customs, see Hassan, 578 F.3d at 126; or the presence of defendant's prior convictions involving khat or cathinone, Abdulle, 564 F.3d at 127.   To be sure, because some of these indicators may be ambiguous, they must be taken in context and evaluated as to whether they in fact contribute to scienter. For example, simply recognizing that khat produces a high is ambiguous, as there are non-controlled substances that also produce highs.   Similarly, the fact that khat has been seized at customs is ambiguous, as agricultural products that are otherwise non-controlled substances may also be seized.   See Caseer, 399 F.3d at 844.   But when considered in the context provided by other evidence, even these facts may be probative of scienter.   See, e.g., Hassan, 578 F.3d at 126.

In addition to the generalized evidence about the structure and operation of the enterprise, aspects of which each defendant had knowledge, the government produced individualized evidence as to each defendant.   To be sure, the amount of evidence unique to each defendant varied, but even so, when it is considered in the overall context and in a light most favorable to the government, it is, we conclude, sufficient as to each defendant to support a conviction.

First, Ismail Abdi, Gurreh, Albukhaiti, and Hassan demonstrated their knowledge that khat was illegal through their direct behavior with law enforcement officers. Ismail Abdi misled FBI agents during an interview, initially claiming that he did not chew khat but later admitting to khat use after being informed that agents had intercepted his telephone calls. He also admitted to agents that he believed that khat was unlawful and that transferring the proceeds of khat sales overseas was unlawful. Likewise, Hassan initially claimed to FBI agents that he had never chewed or distributed khat, but then later claimed that he had used khat on "one or two occasions." Eventually, he admitted to purchasing and using khat more frequently. Albukhaiti, when stopped on a trip to New Jersey to pick up khat, lied to police, telling them that he was there to pick up a friend. Gurreh had a prior state conviction for khat trafficking, which provided direct evidence that he knew that khat was illegal. Moreover, all four of these defendants spoke frequently with Ishak regarding khat, and some of those discussions were about how to orchestrate khat transfers so as to avoid detection by using unmarked or mislabeled packages or by using fake names.

Second, Ali and Yusuf demonstrated their knowledge that khat was illegal during wiretap-recorded telephone conversations in which they discussed the concealment of khat proceeds. In

one such conversation, Ali and Ishak discussed how to break the money transfers into smaller amounts so as to avoid detection, explaining that they learned the technique from Yusuf:  "If I would say 1,000 dollar he would have asked me if I got the money from selling khat. . . .  [I]t's better to send it in small amounts, instead of big amounts. . . .  I learned that from Osman [Yusuf]. . . .  When I give money I also give him two names."  In another conversation, Yusuf discussed khat in code, using the term "CDs" to refer to khat because he and Ishak worried that authorities might be listening to their calls.  In addition to these conversations, other circumstantial evidence demonstrated Ali's and Yusuf's knowledge of khat's illegality. Ali used names other than her own to send proceeds from khat sales to Ishak's suppliers and allowed Ishak to use her credit cards to rent cars in her name to conceal Ishak's identity when distributing khat.  And Yusuf advised Ishak not to meet him at Yusuf's Dahabshil office because it was known that Ishak was a khat dealer.  As noted, Yusuf was also trained as part of his Dahabshil employment to identify khat-related transfers, which is more direct evidence that he knew that it contained a controlled substance.

Third, three other defendants, Muhumed, Isa, and Abdi Omar Abdi, demonstrated their knowledge that khat was illegal through their attempts to evade detection in acquiring khat or

laundering khat proceeds.  All three regularly purchased khat and helped send money to Ishak's suppliers.  Muhumed regularly met Ishak in out-of-the-way locations, including bus stations and gas stations, to cover the purpose of their meetings.  Isa received suspiciously packed shipments of khat from Ishak and also wrote checks to Ishak for khat, but concealed the purpose of the payments by writing "ATM" on the memo line.  Abdi Omar Abdi was instructed by Ishak on how to conceal the transfer of money to avoid police detection by not sending the same amount of money on multiple occasions; by not sending it repeatedly to the same person; and by not using the recipient's real name. Both Abdi Omar Abdi and Isa also knew that khat packages had been, on occasion, seized by customs.

Fourth, Jibril's conduct involved a combination of indicators demonstrating his knowledge that khat contained a controlled substance.  In one recorded telephone conversation, Ishak discussed with Jibril how Ishak would avoid being detected by police while he traveled to distribute khat:  "I do not like people with me because . . . if something happens and you get stopped they cross-examine us separately and we might give different information."  Additionally, as part of his job at Dahabshil, Jibril was trained to recognize and avoid inadvertently aiding money laundering and trafficking, including trafficking related to khat.  He then completed transactions by

breaking them into smaller dollar amounts to avoid detection, and on at least one occasion, he used a false name to send the money. One can infer that from Jabril's training, he knew that the transactions were for the purpose of concealing illicit khat money.

Finally, while the defendants Alashmali, Salhan, and Samantar were less deeply involved in the conspiracy, they nonetheless maintained regular contact with Ishak and knew the extent of the khat distribution operation that Ishak ran. Alashmali was aware of the suspicious circumstances under which khat was transferred from Ishak to the co-conspirators, as he himself received shipments from Ishak at diverse locations, such as his store, a UPS store, and his brother's store. And evidence showed that shipments to his brother's store were mislabeled to conceal their contents. Moreover, Alashmali spoke with Ishak almost daily, and Ishak knew that khat was illegal. Alashmali also interacted regularly with his brother Albukhaiti, who demonstrated his knowledge of khat's illegal nature by lying to police. Likewise, Salhan discussed khat with Ishak regularly and sold khat. He knew the extent of the khat distribution enterprise; he knew that khat had been seized by customs officials; and twice he sent khat money overseas, using a wire transfer. Finally, Samantar resold khat; spoke with Ishak about khat trafficking; sent wire transfers overseas for Ishak

27

approximately three times; and knew that customs officials had, on occasion, seized khat packages.  Indeed, she inquired about a khat shipment with concern, "Was it caught?"

When viewing the evidence in a light most favorable to the government, we conclude that a rational trier of fact could have found the defendants guilty beyond a reasonable doubt.  See Campbell, 977 F.2d at 856.

IV

During trial, the district court made two procedural rulings that the defendants now challenge.  It denied (1) the defendants' request to put on an expert witness who was first disclosed at trial, and (2) Gurreh's motion to sever his trial from the larger one.  We affirm both rulings.

A

After the government rested its case, the defendants sought to present the testimony of an expert witness who had not previously been identified to testify.  The defendants proposed to have him testify that khat contained, in addition to cathinone, the stimulant phenylpropanolamine ("PPA"), which is not a controlled substance and which contributes to the high produced by khat.  They argued that because PPA is not a controlled substance and also produces a high, "there could be a conspiracy to possess with intent to distribute an uncontrolled

28

scheduled substance PPA, which is a direct defense to the government's case. . . . PPA is a stimulant and you can get high and it's not controlled.  So how do you separate the two?" (Emphasis added).

The district court, in ordering that the expert testimony be excluded, ruled that the defendants' request was untimely, pointing out that notice of expert testimony had to be provided no later than 10 business days before trial.  It also ruled that the evidence was irrelevant.  The court observed that it invited the defendants to articulate the reasons for the testimony's relevancy and "found them unpersuasive."

On the untimeliness issue, the court clearly had broad discretion to manage the docket and to impose binding time limits on the disclosure of evidence.  See, e.g., United States v. Goodson, 204 F.3d 508 (4th Cir. 2000); Fed. R. Crim. P. 16. The court pointed out that the defendants had received notice of the fact that PPA was in khat many months before trial and could well have identified their expert on the subject in a timely fashion.  It did not agree that their failure to do so was excused by the fact that not until trial did they realize that they would be unable to question the government's expert about PPA.  We conclude the court did not abuse its discretion in excluding this evidence as untimely.

We also agree that the proffered evidence would not have been relevant. The issue in this case was whether the defendants knowingly distributed or possessed with intent to distribute a <u>controlled substance</u>. The government had the burden of demonstrating that the defendants <u>knowingly</u> distributed or possessed with intent to distribute a <u>controlled substance</u>, and the mere fact that khat also contained other chemicals and substances that were not controlled but that were sought by defendants would not provide a defense to the government's proof as to the defendant's mental state. Thus, we conclude that the district court did not abuse its discretion in also basing its ruling on a lack of relevance. <u>See</u> <u>General Electric Co. v. Joiner</u>, 522 U.S. 136, 138-39 (1997); <u>Friendship Heights Assocs. v. Vlastimil Koubek, A.I.A.</u>, 785 F.2d 1154, 1159 (4th Cir. 1986).

B

During the government's case, counsel for Ismail Abdi cross-examined Ishak with respect to Gurreh's involvement in the conspiracy, allegedly creating antagonistic defenses as to Ismail Abdi and Gurreh. The cross-examination mainly covered the extent of Gurreh's relationship with Ishak, the amount of khat Gurreh sold, and the extent of Gurreh's money laundering. Following this cross-examination, Gurreh filed a motion to sever his trial, which the district court denied.

Federal Rule of Criminal Procedure 14(a) provides, "If the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires." A severance under Rule 14(a) is warranted in cases where there is a "serious risk that a joint trial would compromise a specific trial right of one of the defendants," Zafiro v. United States, 506 U.S. 534, 539 (1993), but the standard raises a high bar, as "[m]utually antagonistic defenses are not prejudicial per se," id. at 538. Indeed, we have found it decidedly preferential to try jointly defendants who have been indicted together. See, e.g., United States v. Singh, 518 F.3d 236, 255 (4th Cir. 2008).

In this case, the testimony elicited about Gurreh during the cross-examination of Ishak by counsel for Ismail Abdi was very likely not prejudicial for at least two reasons. First, nearly the exact same testimony raised on Ismail Abdi's cross-examination of Ishak was also permissibly brought out during the government's direct examination of Ishak. Second, the testimony brought out during Ismail Abdi's cross-examination of Ishak did not make a meaningful contribution to the case against Gurreh. Gurreh's involvement with Ishak and the khat enterprise was not seriously disputed at trial. Based on Ishak's testimony on

31

direct, there was little doubt about Gurreh's involvement. Instead, the primary issue raised by Gurreh was scienter -- whether he knew that khat contained a controlled substance. To that end, Gurreh's prior conviction for khat trafficking was very strong evidence -- so much so that the additional evidence of Gurreh's involvement with Ishak brought out on Ismail Abdi's cross-examination was of minimal importance.

Given our strong preference for jointly trying defendants who have been indicted together, we conclude that in the circumstances of this case, the district court did not abuse its discretion in denying Gurreh's motion to sever.

V

Finally, the nine defendants convicted on Count 2 challenge the sufficiency of the indictment, alleging that its lack of specificity "left open the real possibility the [defendants] were convicted on the basis of facts not found by and perhaps not even presented to, the grand jury which indicted them."  In particular, they contend that the indictment neglected to allege the financial transactions involved, the monetary instruments and funds transferred, and the related unlawful activity.  See 18 U.S.C. § 1956(c)(4)-(5), (7).

We have previously articulated the standard for assessing the specificity of an indictment, stating that "[a]n indictment

is sufficient if it, first, contains the elements of the offense charged and fairly informs a defendant of the charge against which he must defend, and, second, enables him to plead an acquittal or conviction in bar of future prosecutions for the same offense." United States v. Brandon, 298 F.3d 307, 310 (4th Cir. 2002) (quoting Hamling v. United States, 418 U.S. 87, 117 (1974)) (internal quotation marks omitted); see also Fed. R. Crim. P. 7(c)(1).

In Count 2, the grand jury charged a violation of 18 U.S.C. § 1956(h), setting forth all of the statutory elements, including the allegations that the defendants conducted financial transactions involving the proceeds of specified unlawful activity; that they transmitted monetary instruments and funds from the United States to places outside of the United States to promote the carrying on of the unlawful activity; and that the underlying unlawful activity was the conspiracy to distribute or to possess with intent to distribute a controlled substance. In arguing that these allegations were fatally nonspecific, the defendants fail to recognize that the first paragraph of Count 2 incorporated by reference the 37 other paragraphs alleged in the introductory portion of the indictment, where the specific transactions, funds, and related unlawful activity were described. These paragraphs spelled out in detail the factual circumstances describing: how the co-

33

conspirators derived proceeds from the sale of khat and transmitted them to their khat suppliers in England, Somalia, Uganda, and Kenya; the fact that the transfers of proceeds were accomplished through Dahabshil's office in Falls Church, Virginia; and the specific dates of transfers, giving the countries to which the transfers were made.

We have routinely found indictments with this degree of specificity, or less, to be adequate. See United States v. Bolden, 325 F.3d 471, 490-91 (4th Cir. 2003); United States v. Am. Waste Fibers Co., 809 F.2d 1044 (4th Cir. 1987) (per curiam).

Defendants also argue that the required unlawful activity of § 1956(c)(7), as defined in § 1961(1), does not include conspiracy. We rejected similar reasoning, however, in United States v. Tillett, 763 F.2d 628, 633 (4th Cir. 1985), and other circuits have directly rejected this very argument. See, e.g., United States v. Echeverri, 854 F.2d 638, 648-49 (3d Cir. 1988) (describing § 1961(D) as "broad language" that encompasses conspiracy); United States v. Weisman, 624 F.2d 1118, 1124 (2d Cir. 1980), abrogated on other grounds by United States v. Indelicato, 865 F.2d 1370 (2d Cir. 1989) (en banc) ("[W]e think that conspiracy can properly be charged as a predicate act of racketeering under RICO, at least when it involves any of the substantive offenses listed in section 1961(1)(D) . . . . This

34

language is certainly broad enough on its face to include conspiracies involving securities and bankruptcy fraud and drug related offenses"). We now also reject the argument.

Because we conclude that Count 2 adequately informed the defendants of the money laundering charges against them and provided sufficient detail to enable them to plead an acquittal or conviction in bar of future prosecution for the same offense, we reject their challenge.

The judgments of the district court are accordingly affirmed.

<u>AFFIRMED</u>